## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEWPAGE CORPORATION, *et al.*, | ) | Case No. 11-12804(KG) |
| | ) | |
| _____Reorganized Debtors._____ | ) | |
| PIRINATE CONSULTING GROUP, LLC, | ) | |
| AS LITIGATION TRUSTEE OF THE NP | ) | |
| CREDITOR LITIGATION TRUST, | ) | |
| | ) | Adv. Pro. No. 13-52429 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| C. R. MEYER & SONS CO., | ) | |
| | ) | |
| _____Defendant._____ | ) | **Re: D.I. 43, 48** |

## OPINION

## INTRODUCTION

On September 7, 2011 (the "Petition Date"), NewPage Corporation ("NewPage")

and its affiliates (collectively, the "Debtors") filed petitions for relief under Chapter 11 of

the Bankruptcy Code.   On October 29, 2013, PIRINATE Consulting Group, LLC, the

Litigation Trustee of the NP Creditor Litigation Trust (the "Trustee")[1] brought this

---

[1] The Trustee was appointed as trustee of the Liquidation Trust pursuant to section 1.2.30 and Article V of the Plan and paragraphs 39-41 of the Confirmation Order, and as governed by the Litigation Trust Agreement attached as Schedule 1.2.95 to the Plan.  Plan Supplement Exhibits. D.I. 2829.  Pursuant to the Plan and the Confirmation Order, on the effective date of December 21, 2012, the Trustee was appointed to, among other things, evaluate, commence, prosecute, litigate, and settle Committee Litigation claims (as defined in the Plan), including this adversary proceeding.  Plan, D.I. 2904.

adversary proceeding against C.R. Meyer & Sons Co. ("CRM") alleging that payments made to CRM totaling $2,302,634.21 (the "Transfers") are preferential and should be avoided (the "Avoidance Action").  In response to the Complaint, CRM filed an answer denying the allegations and asserting several affirmative defenses, including, among others, that some or all of the payments do not qualify as preferential.  *See* CRM's Answer. D.I. 13.

Pending before the Court is CRM's motion for summary judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, seeking dismissal of the Trustee's preference action.  CRM's Motion.  D.I. 43.  In response, the Trustee filed a cross motion for summary judgment seeking denial of the Motion and summary judgment in the Trustee's favor (the "Cross-Motion").  Trustee's Cross-Motion.  D.I. 48.  The issues presented by the Motion and the Cross-Motion are these: (1) were the Transfers made pursuant to a single unified agreement or separate agreements under applicable state law; and (2) were any of the agreements assumed under the Plan such that CRM has shown, under the *Kiwi* Defense discussed below, that it did not receive more than it would have received in a Chapter 7 case?  For the reasons stated herein, the Court will grant partial summary judgment in favor of the Trustee as to the divisibility of the agreements and partial summary judgment in favor of CRM as to the assumption of the Master Agreement.

**JURISDICTION**

The Court has subject matter jurisdiction over this controversy under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (F).

**FACTS**

The Debtors and CRM have had a business relationship for over twenty years. Declaration of Bradley S. Riutta, dated August 31, 2016 ("Riutta Declaration") ¶ 3. D.I. 43-3. CRM, a Wisconsin corporation, provides general contracting services for large commercial projects, including construction management and consulting. Stipulated Facts ¶ 1. D.I. 38. NewPage, a Delaware corporation, was engaged in the operation of paper mills in various locations throughout the United States. *Id.* CRM handled all of the maintenance and construction needs at the Debtors' plants in Escanaba, Michigan (the "Escanaba Facility") and Duluth, Minnesota (the "Duluth Facility"). Riutta Declaration ¶ 4. Almost two years before the Petition Date, in October 2009, the parties entered into a Master Construction Agreement to provide the terms and conditions of the work CRM would provide for NewPage (the "Master Agreement"). Riutta Declaration ¶ 12-13.

CRM employees at the Escanaba and Duluth Facilities worked at the direction of NewPage employees and their work was later coded against a corresponding purchase order ("Purchase Order") and invoiced to NewPage on a weekly basis. Riutta Declaration ¶ 5. To coordinate such work, CRM supervisors attended maintenance planning

meetings with NewPage employees where they reviewed previously issued repair requests. *Id.* At the Escanaba Facility, CRM maintained its own equipment needed for the maintenance work. Riutta Declaration ¶ 6. CRM also routinely used NewPage's equipment, including a backhoe, optical equipment, and specialty rigging equipment. *Id.* At the Escanaba and Duluth Facilities, NewPage provided CRM with offices, storage space for their equipment, and mill-owned pagers—before cell phones—to allow NewPage to immediately contact CRM supervisors in case of an emergency and to facilitate day-to-day operations. Riutta Declaration ¶ 7.

<u>The NewPage Bankruptcy Case</u>

On September 7, 2011, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. A little over a year later, on December 14, 2012, the Court confirmed the *Debtors' Modified Fourth Amended Joint Chapter 11 Plan* (the "Plan") and entered findings of fact and conclusions of law regarding the Plan and a Confirmation Order. D.I. 2904, 2944, 2945. On December 21, 2012, all conditions to the effectiveness of the Plan had been satisfied or waived, and the Plan was substantially consummated. Stipulated Facts ¶ 3.

The Plan included a provision for the treatment of executory contracts. Article VIII of the Plan provided that the Debtors assumed any executory contract that had not expired by its own terms on, or prior to, the Confirmation Date and was not otherwise addressed during the pendency of the Chapter 11 cases or listed on Plan Schedules 8.1(A)-

(E) (the "Catchall Provision").  Stipulated Facts ¶ 5.  "Executory Contract" is a defined term under the Plan and means "a contract or unexpired lease to which one or more of the Debtors is a party and which is subject to assumption . . . under Section 365 of the Bankruptcy Code at the election of the Debtors."  Plan Art. I.2.62.  The Master Agreement is not listed on Schedules 8.1(A)-(E).  Stipulated Facts ¶ 7.

Post-petition, CRM's day-to-day operations continued as usual at the Escanaba Facility.  Riutta Declaration ¶ 15.  Indeed, CRM fulfilled and invoiced several Purchase Orders, which had been placed pre-petition.  *Id.*  CRM completed $548,087.67 of work pursuant to Purchase Orders outstanding when the Plan was confirmed and NewPage paid for these services after confirmation.  Riutta Declaration ¶ 19.

<u>The Avoidance Action</u>

Before filing the Motion and the Cross-Motion, the parties conducted limited discovery and on August 20, 2015, they engaged in a mediation session.  Stipulated Facts ¶ 11.  As a result of the mediation, the parties entered into a Stipulation and Settlement Agreement (the "Stipulation") agreeing, among other things, to a briefing schedule on the issue of whether the Debtors assumed the Master Agreement and the purchase orders issued thereunder through the Confirmation Order thus providing CRM an absolute defense to the Avoidance Action.  *See* Stipulation ¶ 3.  D.I. 37.  On July 5, 2016, the Court entered an Order approving the Stipulation and the parties filed Stipulated Facts.

<u>The Master Agreement</u>

On October 7, 2009, NewPage, as Owner, and CRM, as Contractor, entered into the Master Agreement, pursuant to which CRM would:

> provide all engineering, design and other similar services; labor; materials; tools; supplies; equipment; machinery; administration; transportation; supervision and all other services and items necessary for the proper execution and completion of the work described in [NewPage]'s purchase orders to be issued from time to time under this Agreement (the "Work") at [NewPage]'s mills located at Rumford, Maine; Escanaba, Michigan; Duluth, Minnesota; Wisconsin Rapids, Wisconsin; Biron, Wisconsin; Whiting, Wisconsin; Stevens Point, Wisconsin and Wickliffe, Kentucky (the "Property").

Stipulated Facts ¶ 6.[2]  Section 1 of the Master Agreement further details the role of the Master Agreement and defines key terms. Under the Master Agreement, the parties were not bound to award or accept all Work from each other: "nothing in this Agreement or in any Purchase Order shall be interpreted as requiring either that Owner award any particular work to Contractor or that Contractor accept any such award except as expressly stated in the Purchase Orders."  Master Agreement § 1.

Further, the Master Agreement refers to each Purchase Order issued by NewPage as a separate contract:

> Each such Purchase Order . . . together with the . . . Agreement . . . shall constitute separate contracts between the Contractor and Owner. Each such separate contract is hereinafter referred to as the "Contract." This Agreement shall serve as a master agreement governing all of the Contracts between Contractor and Owner.

---

[2]  The term "Work" is defined in the Master Agreement and the Court will capitalize the word.

Master Agreement § 1.

The Purchase Orders either reference the Master Agreement directly or the Master Agreement through another Purchase Order stating, "This purchase order and all work performed hereunder shall be subject and controlled by the latest Master Construction Agreement on file."  Riutta Declaration ¶ 11.  In their course of dealing, the Purchase Orders served to document Work to be performed by CRM and to facilitate the payment of invoices.  Riutta Declaration ¶ 9.  The Purchase Orders triggered payment for Work. *Id.* at ¶ 5.  At times, the Purchase Orders were created after CRM employees began Work and, occasionally, after CRM employees completed work.  Riutta Declaration ¶ 8.  If CRM employees completed work without a Purchase Order, CRM needed to follow up with the NewPage accounting department to create the Purchase Order so that CRM could issue an invoice and get paid for the Work.  Riutta Declaration ¶ 10.

In the event that NewPage wished to have CRM perform Work "separate and distinct from Work already covered by an existing Purchase Order," the Master Agreement directed NewPage to "issue a new Purchase Order rather than change order for such new Work. Such new Purchase Order [together with the Master Agreement] shall constitute a new Contract governed by the [Master] Agreement."  Master Agreement § 9.  In fact, the Master Agreement required NewPage to "make payment on account of the Contract . . . upon the written requisition [i.e., invoice] of the Contractor" provided, however, that final payment would not be due until, among other

7

requirements, "the Contract be then fully performed, [and] [NewPage] has approved and accepted the Work." *Id.* at § 17.

## STANDARD OF REVIEW

A bankruptcy court must grant summary judgment where "there is no genuine issue as to any material fact and that each of the moving parties is entitled to a judgment as a matter of law." *In re Kiwi International Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (internal quotations omitted) (citing Fed. R. Civ. P. 56(c)).  In evaluating the evidence, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion.  *Id.*  If the moving party meets the burden, the non-moving party then bears the burden of proving that a material fact exists that makes summary judgment inappropriate.  *IT Litigation Trust v. Alpha Analytical Labs (In re IT Group, Inc.)*, 331 B.R. 597, 600 (Bankr. D. Del. 2005).

## DISCUSSION

According to CRM, the Master Agreement and the Purchase Orders have been assumed and therefore related payments cannot be avoided as preferential – asserting what is known as the *Kiwi* Defense.  *See* Motion at p.12; *see also Kiwi*, 344 F.3d at 317-18. The *Kiwi* Defense is explained as follows.  The Trustee for the debtor, Kiwi International Air Lines, Inc., brought $3.9 million in preference actions against creditors for pre-petition payments.  After Kiwi filed for bankruptcy, it assumed agreements with the creditors. The Third Circuit held that the assumption of a contract under Bankruptcy Code Section

365 barred a preference claim.  Before a debtor assumes an agreement, the debtor must cure all defaults and make the other party to an agreement whole, thereby eliminating any preference claim.

CRM contends that the Master Agreement and all related Purchase Orders were assumed, arguing that these agreements constituted a single contract for purposes of assumption under Section 365 of the Bankruptcy Code.  CRM asserts that as a result of this assumption, the Trustee cannot avoid payments on account of what it argues is one entire agreement.  *See Kiwi*, 344 F.3d at 318.  The Trustee, on the other hand, argues that these agreements constitute separate, distinct agreements.

"State law governs the question whether an agreement is divisible or indivisible for the purposes of assumption and rejection under Bankruptcy Code § 365."  *In re Hawker Beechcraft,* Case No.12-11873, 2013 WL 2663193, at *3 (Bankr. S.D.N.Y. 2013) (citing *Empire State Bldg. Co. v. New York Skyline, Inc.* (*In re New York Skyline, Inc.*), 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010); *see also In re Buffets Holdings, Inc.,* 387 B.R. 115, 120 (Bankr. D. Del. 2008) (holding that divisibility is clearly a question of state law).  In order to determine whether these agreements were assumed the Court must decide whether the Master Agreement and related Purchase Orders constitute one entire agreement or separate divisible agreements whose executoriness must be examined on an agreement by agreement basis.

The Master Agreement and Purchase
<u>Orders Constitute Separate Agreements.</u>

Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A debtor "can only assume a contract *cum onere* – accepting the benefits along with the burdens." *In re Physiotherapy Holdings, Inc.*, 538 B.R. 225, 229 (D. Del. 2015) (citing *In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007)).

The primary issue before the Court is whether the Master Agreement and related Purchase Orders constitute one entire agreement or separate divisible agreements under both Michigan and Wisconsin state law. In order to decide divisibility, the Court must analyze the agreements under state law. *See Buffets*, 387 B.R. at 120. Both parties acknowledge that analysis under Michigan and Wisconsin state laws is proper as the Purchase Orders at issue were for performance in either Wisconsin or Michigan. *See* Riutta Declaration ¶¶ 4-5, 16, 18.

Under both Michigan and Wisconsin state law, it is clear that the intention of the parties is the first and foremost consideration in analyzing the divisibility of contracts. In both states, the apportioning of different prices to different phases of work evidences an intent to form separate agreements.

The Michigan Supreme Court held that for purposes of determining intent, "as a general rule, where the contract requires the performance of several separate and distinct items . . . the contract will be regarded as divisible." *See City of Lansing v. Lansing Tp.*, 97

N.W.2d 804, 813 (1959) (holding that a contract is divisible under Michigan law where it provides for "different sums at different periods before the completion of entire work"). In this case, the Master Agreement provides that the price for the Work discussed in each Purchase Order is the "Contract Sum" stated in each individual Purchase Order. Master Agreement § 5. Thus, as in *City of Lansing* there are "different sums" payable at "different periods," which indicates an intent by the parties to form separate agreements.

Similarly, the Master Agreement and Purchase Orders constitute separate agreements under Wisconsin state law. Wisconsin courts also look to intent to determine divisibility. *See Davies v. J.D. Wilson Co.*, 85 N.W.2d 459, 475 (1957). Under the Wisconsin Supreme Court's holding in *Davies*, the fact that the Purchase Orders set different prices and consideration for distinct jobs indicates an intent to form separate agreements. "It has frequently been held that, if there is an express promise to pay a definite sum as compensation for a prescribed period of service, it is an entire promise." *Id.* (internal citations and quotations omitted). Thus, here the Purchase Orders constitute complete (and thus separate) agreements in light of the individually apportioned Contract Sums. *See* Master Agreement § 5.

Bankruptcy courts have also found that the allocation of prices to specific obligations in similarly structured agreements reflects an intent to form separate agreements. *Hawker Beechcraft* explained that "obligations that ar[i]se under each Purchase Order [a]re divisible from each other" where the "parties' performance was

11

divided into matching parts corresponding to the [] obligations created by each Purchase

Order." *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB), 2013 WL 2663193, at *8 (Bankr.

S.D.N.Y. June 13, 2013) (recognizing that a master agreement setting forth terms and

conditions to be incorporated into purchase orders supported a finding of divisibility).

This reasoning is echoed in *Carlisle Corp. v. Uresco,* where the district court

similarly found that because each purchase order stemming from a broader

distributorship agreement created a separate right to payment, each order constituted a

complete contract. *Carlisle Corp. v. Uresco Const. Materials, Inc.*, 823 F. Supp. 271, 274 (M.D.

Pa. 1993) (holding that because the distributorship agreement and the purchase orders

did not form one agreement, there was no right to setoff).

Further, the plain language of the Master Agreement indicates an intention for the

Purchase Orders to constitute "separate contacts[s]."  The Master Agreement clearly

states that each new Purchase Order "shall constitute separate contracts."   Master

Agreement § 1.  Thus, the intent of the parties to form separate agreements is clear.  As

such, the Court finds that the Master Agreement and the Purchase Orders are separate

agreements.

CRM Has Not Met Its Burden
<u>With Regard to the Purchase Orders</u>

As a defense to the Trustee's preference claims, CRM is alleging that the

agreements, i.e., the Purchase Orders, constitute executory contracts, and is attempting

to use the *Kiwi* Defense as a shield.  Thus, CRM has the burden to establish that <u>each</u> of

12

these separate agreements was executory.  *See In re Bernard L. Madoff Inv. Secs., LLC*, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010) (holding that a trustee asserting good faith as a defense to avoid a transaction bears the burden of establishing such good faith).

The Plan defines an executory contract as "a contract or unexpired lease to which one or more of the Debtors is a party and which is subject to assumption . . . under section 365 of the Bankruptcy Code at the election of the Debtors."  Plan, at 9.  Under the Catchall Provision of the Plan, the Debtors automatically assumed any executory contract that had not expired by its own terms on, or prior to, the Confirmation Date and was not otherwise addressed in the course of the Chapter 11 or listed on Plan Schedules 8.1(A)-(E).  Plan, at 57-58.

CRM has not met its burden with regard to the Purchase Orders.  CRM argues for a finding that the entire group of agreements are executory – the Master Agreement and the Purchase Orders.  CRM makes no attempt to argue that the separate Purchase Orders were executory.  Rather, CRM's entire argument rests on the premise that these separate agreements in fact all made up the Master Agreement.  For example, in the Motion, CRM argues that "both CRM and NewPage had multiple outstanding material obligations to each other pursuant to various provisions of the Master Agreement and at least nineteen open Purchase Orders for Work to be completed on the Escanaba Facility."  *See* Motion p.13.

The Trustee has not put forth any arguments as to the executoriness of the individual Purchase Orders.  The Court therefore cannot rule on whether payments on account of any of the Purchase Orders can be avoided by the Trustee under Section 547 of the Bankruptcy Code, and whether they entitled to the *Kiwi* Defense.

The Master Agreement is an Executory Contract
<u>That Was Assumed By the Debtor.</u>

The Master Agreement is an executory contract for purposes of Section 365 of the Bankruptcy Code. An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.*" In re LG Philips Displays USA, Inc.*, No. 06-10245, 2006 WL 1748671, at *3 (Bankr. D. Del. 2006) (internal citations omitted). The Master Agreement imposes material obligations on CRM and the Debtor which were executory on the Petition Date.

The Master Agreement is executory regardless of its relationship to the separate Purchase Orders.  Performance under the Master Agreement "was independent of like exchanges under other Purchase Orders." *See Hawker Beechcraft*, 2013 WL 2663193, at *8 (finding terms of a master agreement that reflected obligations arising under separate purchase orders were divisible from each other). Thus, the relation of obligations under the Master Agreement to those contained in Purchase Orders has no bearing on whether each are executory.

14

Under the Master Agreement, CRM had an obligation to provide all necessary engineering and servicing items in order to complete Purchase Orders arising before the Preference Period, as well as to complete Work on schedule.  *See* Master Agreement §§ 1-2. CRM was required to maintain certain types of insurance during the pendency of Work.  *See id.* §§ 24-25.  The Debtors were required to comply with payment terms in the Purchase Orders as well as reimburse for certain expenses listed in Section 7 of the Master Agreement.  *See id.* § 7; *see also Hawker Beechcraft*, 2013 WL 2663193, at *8 (holding the existence of corresponding terms in a purchase order irrelevant to whether a master agreement is executory).   Both parties were under an obligation to maintain confidentiality under the Master Agreement.  *See id.* § 12.  These obligations make the Master Agreement executory.  A violation of any of the obligations discussed above would result in breach of the Master Agreement.  The Court therefore finds the Master Agreement to be executory, and consequently assumed under Article VIII of the Plan.  *See* Stipulated Facts ¶ 5; Plan. Art. I.2.b2.

## CONCLUSION

For purposes of Section 365 of the Bankruptcy Code, the Master Agreement and each of the Purchase Orders is a separate contract.  The Master Agreement is an executory contract that has been assumed by the Debtors under the Plan.  The Court has not been presented with sufficient evidence nor argument to allow it to determine whether or

which Purchase Orders were executory, and thus whether related payments are protected under *Kiwi.*

The Court will grant the following relief:

1.      The motion will be granted as to the Master Agreement being an assumed executory contract, subject to the *Kiwi* Defense.

2.      The Motion and Cross-Motion will be denied on the issue of whether the Purchase Orders were assumed and therefore are protected by the *Kiwi* Defense.  The issue remains to be determined at trial.

3.      The Cross-Motion will be granted as to the claim that the Master Agreement and the Purchase Orders are divisible, separate agreements.

4.      The Cross-Motion will be denied as to the claim that payments for the Purchase Orders are to be avoided, a matter to be determined at trial.


Dated:  February 13, 2017

KEVIN GROSS, U.S.B.J.